**SIGNED.**

Dated: September 11, 2009



_____
**JAMES M. MARLAR**
**U.S. Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| DSBC INVESTMENTS, L.L.C., | ) ) | No. 4:09-bk-03146-JMM |
| Debtor. | ) ) | **MEMORANDUM DECISION** |

      This court has been asked to decide the issue of whether an oversecured creditor, fully paid, in cash, its contract rate of interest and its principal, pursuant to a confirmed plan, is also entitled to pre- and post-petition late charges and default interest. Also pending is a dispute as to whether the attorneys' fees and costs sought by the creditor are reasonable.

      The parties have fully briefed and argued the points, and the court has reviewed the relevant law.

## JURISDICTION

      This court has core jurisdiction over the resolution of claims. 11 U.S.C. § 157(b)(2)(B).

# ISSUES

1. Is an oversecured creditor, paid its contract rate of interest and principal, in full and in cash, pursuant to a confirmed Chapter 11 plan, entitled to also be paid its late charges and default interest?
2. What amount is reasonable for the secured creditor to add to its claim for its attorneys' fees and costs?

# FACTS

## A. The Loan and the Collateral

The real property owned by the Debtor is known as the Sandspur Ranch, and is located on 18.47 acres at 93rd Street and Cactus Road, Scottsdale, Arizona.

Between 2005 and 2007, $1,750,000 was borrowed from National Bank of Arizona (NBA) in order to develop the property and to pay outstanding taxes. The real property was pledged to secure that obligation. When the debt was not timely paid, NBA noticed a trustee's sale under its deed of trust, setting such sale for February 25, 2009.

On December 8, 2008, NBA sold and assigned its note and loan documents to the secured creditor herein, Pivotal Capital Corporation. Pivotal moved forward toward completing the noticed trustee's sale.

On February 24, 2009, the Debtor filed a Chapter 11 case, and the trustee's sale was halted by the automatic stay of 11 U.S.C. § 362(a).

**B. The Chapter 11 Case**

The Debtor filed its Chapter 11 case as a "single asset real estate" case, and listed the fair market value of the land, in its schedules, at $8,000,000. It listed the Pivotal debt at $1,453,174.66.

The unsecured debts, totaling $96,630.51, were listed as owing to nine creditors. None were disputed, contingent or unliquidated.[1]

Later, the Arizona Department of Revenue was added as a $300,417.78 priority creditor, as was the Internal Revenue Service for $1,440,677.91, and Maricopa County was added for its outstanding real estate taxes for $68,085.44.

Debtor's case moved swiftly through the Chapter 11 process. A plan and disclosure statement were filed on May 7, 2009, a month and a half earlier than the court had ordered (June 24, 2009). The Debtor's plan was uncomplicated. It provided for a sale of the property to Dean and Teresa Wikel for $4,350,000, closing on or before July 31, 2009. From the proceeds, the following creditors were to be paid:

- Maricopa County Treasurer (real estate taxes)     $71,160.19
- Pivotal Capital Corporation
  - Principal     1,392,161.11
  - Contract interest (9.25%) to date of filing (02/24/2009)     80,126.61
  - Contract interest (9.25%) from 02/24/09 to date of closing (assuming closing date of 07/31/09)     56,160.17
- Internal Revenue Service     1,328,545.63
- Arizona Department of Revenue     294,105.86
- Kimberly-Horn and Associates     37,555.05
- Realty Executives (3%)     ---
- Unsecured creditors     96,630.51

---

[1] As none of these creditors were listed as disputed, unliquidated or contingent, they were not required to file claims. *See In re Dynamic Brokers, Inc.*, 293 B.R. 489, 495-96 (9th Cir. BAP 2003); 11 U.S.C. § 1111(a); FED. R. BANKR. P. 3003.

As for the disputed portion of Pivotal's claim, the plan provided that the sum of $364,102.62 should remain segregated and reserved, and that any lien claim of Pivotal would attach to those proceeds, until the court could decide the entitlement issues.

Plan confirmation proceedings were held on July 16, 2009, and an order confirming the plan was docketed on July 20, 2009. No appeals were taken, and the order of confirmation is now final.

The sale closed timely, the sums set forth above have been disbursed and the plan has been substantially consummated.

## **LAW**

### **A. Default Interest and Late Fees**

Twenty-one years ago, the Ninth Circuit disposed of the issues surrounding Pivotal's claim for default interest and late fees, by holding that a cure, pursuant to a plan, both restores the parties to their pre-default status, and simultaneously nullifies all consequences contractually flowing from a default. *In re Entz-White Lumber and Supply, Inc.*, 850 F.2d 1338, 1342 (9th Cir. 1988).

This court holds that there have been no changes in the law since the 1988 decision which would dilute or change *Entz-White's* holding. Therefore, Pivotal's claim to default interest and late charges, in view of its payoff and cure pursuant to a confirmed and final Chapter 11 plan, must be rejected as a matter of law.

Section 1123(a)(5)(G) provides that a confirmed plan, which is adequately implemented, can cure or waive "any default." The facts in the instant case closely mirror those which existed in *Entz-White*. Recently, courts in the Ninth Circuit, which have been squarely asked to decide the same question presented here, have uniformly followed the precedent of *Entz-White*. *See, e.g., In re Phoenix Business Park Ltd. P'ship*, 257 B.R. 517 (Bankr. D. Ariz. 2001) (Judge

Case) (collecting cases and providing more jurisdictional history); *In re Zamani,* 390 B.R. 680 (Bankr. N.D. Cal. 2008) (also analyzing §§ 1123(a)(5)(G) and 365(b)(2)(D)).

This court does not need to re-invent the wheel, nor could it write more eloquently than did Judges Morgan and Case, in reaching the same conclusion. Their reasoning in both the *Phoenix Business Park* and *Zamani* cases cannot be improved upon by this court.

In the *Phoenix Business Park* case, Judge Case addressed the same arguments made by Pivotal here, and gave them no weight. Like Judge Case, this court also "has little difficulty concluding" that Pivotal's default rate of 18%--against a contract rate of 9.25% ($113,502.97), as well as Pivotal's one-time late charge of $140,325.01 (or even accumulated late charges), should be construed either as a "penalty rate" or "penalty provision" within the meaning of § 365(b)(2)(D). *See id* at 520-21. This is especially so in view of the fact Pivotal could articulate no specific compensatory feature or prejudice relating to either the default interest or the late charges. Attorneys' fees have been properly sought under a different standard, § 506(b), and they will be addressed in a following section of this memorandum. Thus, since no evidence was presented to show that $253,827.98 was intended to compensate Pivotal for anything, this court must conclude that Pivotal received the entire benefit of its bargain when it received every dime of its outstanding principal and contract rate of interest, to date of payment. Any amount exceeding that payoff is nothing short of a penalty. Such a full payoff, without penalty, conforms to the statute and the Ninth Circuit precedent, and is the very definition of "cure." Importantly, it is also true to the equitable spirit of the Bankruptcy Code, which ensures that no class of creditor or interest holder unduly receives more (or less) than its fair share in "the adjustment of the debtor-creditor or the equity security holder relationship." 28 U.S.C. § 157(b)(2)(O). It is difficult to argue, with a straight face, under the federal bankruptcy statutes, that a creditor who receives every penny of its contractual bargain should also receive an additional sum on top of it.

Similarly, Bankruptcy Judge Marilyn Morgan also had the opportunity to comment upon the same arguments made here by Pivotal. *See Zamani.* Her conclusions were similar to those of Judge Case, and her reasons for so concluding are accepted by this court.

As Judge Morgan pointed out, no court at any level of the Ninth Circuit has held that *Entz-White* has been diluted by any Congressional amendment to the Bankruptcy Code made since *Entz-White* was decided in 1988. *See, e.g., In re Yett*, 306 B.R. 287 (9th Cir. BAP 2004); *In re Hassen Imports P'ship*, 256 B.R. 916, (9th Cir. BAP 2000) (dicta); *In re Udhus*, 218 B.R. 513 (9th Cir. BAP 1998).

The Circuit itself has reaffirmed the *Entz-White* principles. *See, e.g., In re Southeast Co.*, 868 F.2d 335 (9th Cir. 1989); *Gen. Elec. Capital Corp. v. Future Media Productions, Inc.*, 547 F.3d 956 (9th Cir. 2008); *In re Sylmar Plaza, L.P.,* 314 F.3d 1070 (9th Cir. 2002); *In re Claremont Acquisition Corp.,* 113 F.3d 1029 (9th Cir. 1997). Thus, because the Debtor in this case was able to cure the monetary defaults by the payment of money pursuant to the terms of a confirmed Chapter 11 plan, the penalty provisions for <u>additional</u> cash requirements cannot be collected.

The fundamental underlayment of how much creditors should get in the context of a confirmed Chapter 11 plan is firmly rooted in equity. As noted by the United States Supreme Court in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct 237, 91 L.Ed. 162 (1946), "A . . . reorganization court is just as much a court of equity as were its statutory and chancery antecedents." *Id.*, 329 U.S. at 165, 67 S.Ct. at 241. This is only one of many similar pronouncements made by the Court on bankruptcy issues. *See, e.g., Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

The purpose of the bankruptcy laws is not to create state-by-state or contract by contract windfalls, but instead, as the U.S. Constitution requires, to require "uniform laws on the subject of Bankruptcies." U.S. CONST. art. I, § 8, cl. 4, *Vanston* 329 U.S. at 172, 67 S.Ct. at 244 (Frankfurter, J., concurring):

> The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country regardless of the State in which the bankruptcy court sits.

There is no need to over-complicate what is an easily understood concept. "Cure" means a nullification of all default-triggering consequences. That is what the statute means. That is the law of the Ninth Circuit through its *Entz-White* decision. *Entz-White* uniformly governs the bankruptcy

law within the Circuit. And, importantly, *Entz-White* is the correct result as a matter of national bankruptcy policy.

Pivotal's claims for default interest and late charges, which this court understands to be $253,827.98, are therefore OVERRULED.

## B. **Attorneys' Fees and Costs**

Pivotal has requested an award of attorneys' fees and costs, which it states that it has incurred since the Debtor's default. As it authority therefor, it relies upon its contractual agreement with the Debtor, and 11 U.S.C. § 506(b). That section provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

The Debtor does not quarrel with the loan documents which allow fees and costs, but only argues as to the reasonableness of the amount claimed.

The claim of Pivotal, for attorneys' fees and costs, which it asks the Debtor to pay, breaks down in the following manner:

**Pre-Petition**
- <u>Snell & Wilmer</u>
  – Fees      $1,261.50
  – Costs      994.76
- <u>Lewis and Roca</u>
  – Fees      14,158.00

**Post-Petition**
- <u>Snell & Wilmer</u>
  – Fees      $671.00
  – Costs      23.21
- <u>Lewis and Roca</u>

|  |  |
|---|---:|
| – Fees | 74,207.00 |
| – Costs | 8,593.27 |
| **TOTAL** | **$99,908.74** |

What the parties must recognize at the outset is, in determining what is reasonable fee to be paid by a party who had no control over what the opposing lawyers did, nor how they were instructed to proceed, a court must attempt to place itself in the position of a "reasonable" secured creditor and its attorneys. Some hindsight is obviously helpful, but the most important thing is to place oneself in the shoes of the attorneys at the time the work was being done, and assess whether the work performed was necessary at the time, or if necessary, whether too much time was expended for the tasks at hand.

### 1. <u>Legal Discussion (Attorneys' Fees and Costs)</u>

The Bankruptcy Code, 11 U.S.C. § 506(b), requires a court to consider, when measuring the amount of a secured claim, what is a reasonable attorneys' fee. As noted above, the statute provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

More than almost any other proceeding in bankruptcy, a decision on an attorneys' fee request rests within the sound discretion of the trial judge. Courts, in looking at the reasonableness of an attorneys' fee claim in a bankruptcy proceeding, have stated that it is "inherently unreasonable" to incur fees that are not cost-justified either by the economics of the situation or as necessary to preserve the particular party's interest in light of the legal issues involved. *See, e.g., In re Wonder Corporation of America,* 72 B.R. 580, 588 (Bankr. D. Conn. 1987); *In re Nicfur-Cruz Realty Corp.,* 50 B.R. 162, 169 (Bankr. S.D.N.Y. 1985).

In measuring reasonableness of fees, numerous judicial philosophies combine to assist a court. In addition to a judge's own experience, a court can draw upon the "lodestar" method (lawyer time multiplied by an hourly rate), application of the twelve *Johnson* factors,[2] and a host of other judicial comments upon the subject. *See, generally, In re Pettibone Corp.,* 74 B.R. 293 (Bankr. N.D. Ill. 1987).

A case, which is generally cited for setting forth "twelve rubics" for a trial court to consider, in its determination of what constitutes a reasonable fee, is *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Those twelve factors, however, are not "self-actuating: simply to articulate those twelve factors ... does not itself conjure up a reasonable dollar figure in the mind of the district judge." *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557 (Bankr. Utah 1985)(quoting from *In re Casco Bay Lines,* 25 B.R. at 754). As Judge Allen noted in *Jensen-Farley*:

> In general, the statutory factors under Section 330 and the Johnson factors consist of three components: (1) the quantity factor, comprised of documented time at customary billing rates; (2) the quality factor, comprised of the competency of the representation, taking into account the novelty and difficulty of the issues presented, the skill required, the time constraints, and the personal qualifications of the applicant; and (3) the result factor, comprised of the actual results achieved in the case.

Id. at 587.

In the case of *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bankr. 1st Cir. 1982), the Bankruptcy Appellate Panel for the First Circuit stated that a court's initial approach, in determining a reasonable fee, is to multiply the number of hours reasonably expended on the case by a reasonable hourly rate. This is known as the "lodestar fee setting approach." However, as the *Casco Bay Lines* court stated, it is the quality of representation and the results that are most significant in determining the amount of the fee:

> It is under the heading "quality of representation" that a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding, and the benefit to the estate to see if circumstances warranted adjustment of the lodestar figure. Where an attorney's services have produced particularly exceptional benefits for the estates, an upward

---

[2] *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974).

> adjustment of the lodestar may be warranted to compensate for an hourly rate that turned out to be overly conservative. Similarly, if a high-priced attorney performs at a competent but undistinguished manner, a decrease in the hourly rate would be warranted.

*Id.* at 756.

The trial court has discretion in awarding what it considers to be a reasonable fee. A court's discretion "means a sound discretion ... exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." *In re AWECO, Inc.,* 725 F.2d 293, 298 (5th Cir. 1984) (review of bankruptcy approval of a compromise application).

The First Circuit said in *Boston and Maine Corp. v. Moore,* 776 F.2d 2, 9 (1st Cir. 1985):

> To determine the number of hours "reasonably" spent, as well as in setting a "reasonable" hourly rate, a court must review the work to see whether "counsel substantially exceeded the bounds of reasonable effort," ... and should disallow hours that were "duplicative, unproductive, excessive, or otherwise unnecessary.

These general principles are applicable when a secured creditor seeks to charge its expenses against its debtor, and when it relies on its contract and § 506(b).

Here, Pivotal, a fully-secured creditor in first lien position on the Debtor's commercial real property, has claimed $99,908.74 for fees and costs associated with the protection of its interest. The Debtor disputes these amounts. This being the case, the court must determine if the fees and costs are reasonable, in order to be allowed as part of the creditor's secured claim. 11 U.S.C. § 506(a).

In *In re Masnorth Corp.,* 36 B.R. 335, 339 (Bankr. N.D. Ga. 1984), the Court bluntly noted:

> While Midland [the secured creditor] is free to assert all bona fide claims before the Bankruptcy Court, Midland is not necessarily entitled to saddle the debtor with all the attorney's fees and expenses incurred so as to impede the debtor's ability to reorganize.

Pivotal is a fully secured creditor whose delinquencies were cured and fully paid when the Debtor

sold the secured property. The sale provided ample funds for payment of the full amount of the debt, as well as the claimed attorneys' fees and costs, these being subject to the determination of this court as to their reasonableness.

### 2. **Application of Law to the Facts (Attorneys' Fees and Costs)**

Considerations of fairness, results obtained, difficulties encountered, novelty of issues presented, and time and experience of those involved must all be weighed.

### a. **Pre- and Post-Petition Work - Snell & Wilmer**

The Debtor defaulted on its contractual obligations under the NBA note prior to December 17, 2008. That default led NBA to post and notice a trustee's sale, under its deed of trust, for February 25, 2009.

The law firm of Snell & Wilmer was hired by the secured creditor to monitor and handle the trustee's sale relative to the real property, and the Uniform Commercial Code sale relative to any personal property also securing the debt.

The court has reviewed the individual time entries concerning this necessary work, and concludes that a fee of $1,932.50 for a corporate debt of almost $1.5 million is reasonable.

So, too, are Snell & Wilmer's requested costs of $1,017.97.

These fees and costs, then, totaling $2,950.47 are allowed to Pivotal, for this phase of the work.

### b. Pre- and Post-Petition Work - Lewis and Roca

#### (i) General

This case was filed on February 24, 2009, and ended with a confirmed plan on July 20, 2009, a period of five months, start to finish.

The plan and disclosure statement were filed on May 7, 2009, just 2 1/2 months into the case.

#### (ii) Pleadings filed by Pivotal

During the course of the case, Pivotal filed 18 pleadings, as follows:

| Date | Description | DN |
|---|---|---|
| 02/27/09 | Notice of appearance | DN 6 |
| 03/02/09 | Motion for 2004 exam and proposed order (objected to by Debtor) | DN 9 |
| 03/03/09 | Reply re 2004 exam | DN 13 |
| 03/02/09 and 03/05/09 | Motion and notice of hearing re Debtor's counsel's employment (later denied as moot or premature on 04/09/09 at DN 22) | DN 10 DN 14 |
| 03/31/09 | Amended notice of hearing | DN 20 |
| 05/06/09 | Motion for 2004 exam and proposed order | DN 36 |
| 05/12/09 | Opposition to 2004 exam requested by Debtor | DN 45 |
| 05/12/09 | Objection to shortening of time for disclosure statement and plan | DN 46 |
| 05/29/09 | Reply re 2004 exam | DN 50 |
| 06/05/09 | Certificate of service of response | DN 52 |
| 06/10/09 | Notice of deposition of Bobby Lee | DN 53 |
| 06/10/09 | Amended notice of deposition of Bobby Lee | DN 54 |
| 06/11/09 | Objection to disclosure statement | DN 58 |
| 06/18/09 | Objection to disclosure statement | DN 62 |
| 06/18/09 | Supplemental objection to disclosure statement | DN 63 |

| | | |
|---|---|---|
| 07/09/09 | Objection to confirmation | DN 68 |
| 09/01/09 | Memo in support of claim | DN 75 |

### (iii) Hearings/Depositions

Counsel for Lewis and Roca attended the following hearings or proceedings:

| | |
|---|---|
| 04/09/09 | Employment of attorney/2004 motions |

- On the first issue, the court found the argument had been rendered moot by the passage of time (DN 22).
- The parties amicably resolved the 2004 request.

| | |
|---|---|
| 04/09/09 | Section 341(a) meeting. |
| 06/16/09 | Deposition of Bobby Lee (110 pages) (less than 6.8 hours). |
| 06/18/09 | Disclosure statement (approved by court). |
| 07/16/09 | Plan confirmation (Pivotal's plan objections announced as resolved). |
| 09/03/09 | Pivotal's claim |

### (iv) Pre-Petition, January 15 - February 24, 2009

Between January 15 and February 24, 2009, Lewis and Roca attorneys or paralegals spent 35.4 hours, adding up to $12,825.50. Many of the matters on which they were working, or discussing with Pivotal, have been redacted from their exhibit, but the gist of the matters all appear to relate to the attempts by the Debtor and Pivotal to negotiate some resolution and forbearance, while at the same time holding out the threat of filing a Chapter 11.

These discussions would lead naturally to more intense review of how a Chapter 11 might unfold, the early lining out of strategies for dealing with it, and perhaps beginning the drafting of pleadings to address, at an early stage, anticipated bankruptcy issues.

While this type of work appears to be normal under all of the circumstances, Pivotal and its attorneys have hindered the court's reasonableness review by blacking out portions of the time entries of January 29 and 30, February 2, 4, 17-20 and 23.

Accordingly, without evidence as to what such unknown entries were, and how the matters related to the ongoing events, the court finds, from its experience and what it would believe to be reasonable, that the redacted items (adding up to $11,955), should be appropriately discounted.

Thus, for the period January 15 - February 24, 2009, the court awards $6,400 as a reasonable fee for the activity occurring during that phase of the case.

### (v) Post-Petition, February 24 - 28, 2009

In the first five days of the Chapter 11 case, Lewis and Roca's attorneys and paralegals spent 17.5 hours, totaling $6,126, considering the ramifications of the Debtor's Chapter 11 case.

As in the prior period, redactions were made to the Lewis and Roca billings, making the court guess as to what exactly was done on entries for the dates February 24, 25, 27 and 28.

All that was filed with the court was a notice of appearance, but it appears some work was performed preparing a 2004 examination request and related orders. The entries mostly appear to relate to the 2004 examination paperwork. While 5.8 hours appears to have been spent on the 2004 examination paperwork, this court will only allow 1.5 hours, at a rate of $200 per hour, or $300 for such effort.

Conversations with the clients, and review of the Debtor's schedules, might consume another 3.0 hours over the course of five days.

Certainly, more than five hours for these few days, for the work that needed to be done, was excessive.

Accordingly, for this period and the work deemed necessary thereto, the court will allow a reasonable fee of $1,000.

14
Case 4:09-bk-03146-JMM    Doc 78    Filed 09/11/09    Entered 09/14/09 11:40:41    Desc
Main Document    Page 14 of 20

### (vi) Post-Petition, March 1 - 31, 2009

Entries for March 2, 3, 6, 9, 12, 18, 19, 20, 23, 30 and 31 were substantially blanked out.

During that month, in court papers, the parties disagreed as to the extent of the 2004 examinations, and whether counsel's employment was properly timed. The former issue was later resolved, and the latter issue deemed moot by the passage of time. No court appearances were required during that month.

During March, Lewis and Roca spent 5.6 hours, totaling $2,567.50. Because the nature of the work done was substantially omitted from the court's paperwork, having been redacted by Lewis and Roca, the court finds and concludes that $500 is a reasonable sum to allow for that month.

### (vii) Post-Petition, April 1 - 30, 2009

April had one court proceeding, which had been reduced to a formality by the hearing date, and the § 341(a) meeting. Pivotal filed no pleadings in April.

Lewis and Roca's time entries are replete with huge chunks of redactions (April 1, 3, 7-10, 13, 14, 19, 20, 22, 24, 28 and 30). Nonetheless, Pivotal urges the court to award it $11,217 for 30.1 hours of time.

Other than the single routine and resolved court hearing on April 9, and the § 341(a) meeting on the same day, the court has little additional information which it can glean from Lewis and Roca's billing records.

Accordingly, the court feels that it is being generous in awarding Lewis and Roca $1,000 for April's work, which appears to be either unexplained or otherwise made up of garden variety communications and a couple of minor matters outside of the office.

**(viii) Post-Petition, May 1 - 31, 2009**

May produced more discovery-related problems, but no court appearances.

Again, blacked-out entries occurred on the following dates: May 3-16, 18-23, 25 and 27-29.

The principal areas of controversy and necessity for legal expertise appeared to be related to more 2004 requests, and analyzing the Debtor's disclosure statement.

Lewis and Roca billed $31,021 for 83.1 hours of work.

During this month, discovery plus a short objection to a 100% sale plan does not appear to require $31,021 of effort. The matters during this month, unless the court were to have been provided with unredacted copies, would only appear to justify, on its face, about $2,000 worth of work. Anything beyond that sum is unreasonable, and overworked.

The court will allow a $2,000 fee for the month of May.

**(ix) Post-Petition, June 1 - 30, 2009**

June brought a single deposition and a disclosure statement hearing. The latter was approved by the court. Pivotal filed objections to the disclosure statement which, in the end, were either acceded to by the Debtor or proved to be of little consequence.

Lewis and Roca redactions were made to its entries of June 1-11, 15-18, 24 and 25.

Events during June were a 110-page deposition of Bobby Lee (Debtor's representative), and disclosure statement objections. There was a simple, short court appearance on approval of the disclosure statement.

For June, Lewis and Roca billed $21,466.40 for 58.4 hours of work.

Properly billed items, to be charged to the Debtor, include review of motions, working on a proof of claim, conversations with the client and opposing counsel, preparation for and taking of a deposition, and some of the work related to opposing the plan and disclosure statement.

For all of this work, and after review of the major items for June, the court concludes that a fair fee to be charged to the Debtor is $7,500.

### (x) Post-Petition, July 1 - 31, 2009

July brought confirmation and consummation of the Debtor's plan, which the Debtor had been espousing since the beginning days of the case.

Redactions were made to Lewis and Roca's time entries of July 8, 9, 14-17, 28 and 29. Time expended was 20.7 hours, totaling $7,093.85 in fees.

Although Pivotal objected in writing, it resolved its objection in order to accommodate confirmation. Much of the work performed in July was appropriate, but due to the unexplained redactions, this court will award a fee of $5,000 for the work done in the month of July.

### (xi) Post-Petition, August 1 - 14, 2009

Finally, Lewis and Roca claims it worked 11.7 hours, at a fee of $3,002.85. Redactions were made to every entry submitted--August 3, 5-8, 12 and 14. Because the sale closed and the client was paid, the court gleans that most of that time was in preparation of a legal memorandum to support its claim for default interest, late charges and fees.

As set forth in the first section of this memo, fighting for default interest and late charges on an issue that Ninth Circuit decided 21 years ago (when Lewis and Roca was the winning counsel for the position it now asks this court to overturn), it would be unjust to charge the Debtor for this final act of futility. If the secured creditor chose to roll the dice, the secured creditor can pay for the privilege.

### (xii) Costs

The court will award Pivotal the following Lewis and Roca costs:

1. Long distance;
2. Photocopying; and
3. Deposition costs (Lee)

All other Lewis and Roca costs will be disallowed, and attributable to non-compensable overhead.

## **GENERAL COMMENTS, FINDINGS, AND CONCLUSIONS**

On balance, and looking at the case in its overall proportion, the court finds and concludes that the total creditor's bill, sought to be charged to the Debtor, is unreasonably high. This is not to say that the work was not done, but it appears to be excessive for the work that actually <u>had</u> to be done, and the time it should have taken to do it.

In this case, the court finds that the issues were neither complex nor novel. Indeed, they were quite routine. The court cannot accept that such efforts - for a secured creditor's single-minded purpose of either getting payments, or monitoring a refinance or sale which provided for its payoff, would cost just shy of $100,000. Frankly, the issues and intensity of this case did not rise to such level. The creditor overworked the case beyond the boundaries of fairness.

The court appreciates the creditor's need for specialized bankruptcy assistance, and is sensitive to it. However, considering the entire record in this matter, the court is left with the clear impression that the time spent by the secured creditor's professionals was excessive. Translated into § 506 terms, then, the charges are not "reasonable." To the extent that a creditor wishes to expend such resources, that is a business decision which it is free to make. However, a creditor may not run the engine at full throttle and expect its borrower to pay the entire fuel bill. For these reasons, the total amount of the fee award to Pivotal for Lewis and Roca's fees is determined to be $23,400, which is made up of the following:

| January 15 - February 24, 2009 | $6,400.00 |
| February 24 - 28, 2009 | 1,000.00 |
| March 1 - 31, 2009 | 500.00 |

| | |
|---|---:|
| April 1 - 30, 2009 | 1,000.00 |
| May 1 - 31, 2009 | 2,000.00 |
| June 1 - 30, 2009 | 7,500.00 |
| July 1 - 31, 2009 | 5,000.00 |
| August 1 - 14, 2009 | 0.00 |
| **Total** | **$23,400.00** |

In addition, costs for long discharge telephone charges, photocopies and the deposition costs may be added.

### **RULING**

A separate order will be entered (FED. R. BANKR. P. 9021) which:

1. Disallows any claim by Pivotal for default interest and/or late charges;
2. Allows reasonable attorneys' fees for work performed by Snell & Wilmer in the sum of $1,932.50;
3. Allows costs incurred by Snell & Wilmer in the sum of $1,017.97;
4. Allows reasonable attorneys' fees for work performed by Lewis and Roca in the sum of $23, 400;
5. Allows costs to Pivotal, which Lewis and Roca shall be entitled to collect on behalf of its client, for out-of-pocket expenses for photocopying, long-distance phone calls and the Bobby Lee deposition.

Any entity aggrieved by the order has ten days to appeal therefrom. FED. R. BANKR. P. 8002.

DATED AND SIGNED ABOVE.

1  COPIES served as indicated below on the
   date signed above:
2
   Sally M Darcy
3  McEvoy, Daniels & Darcy
   4560 East Camp Lowell Drive
4  Tucson, AZ 85712
   Attorneys for Debtor                                    Email: DarcySM@aol.com
5
   Rob Charles and Erin O. Simpson
6  Lewis and Roca
   One South Church Ave., Suite 700
7  Tucson, AZ 85701                                        Email: RCharles@LRLaw.com
   Attorneys for Pivotal Capital Corporation               Email: ESimpson@LRLaw.com
8
   Christopher J Pattock
9  Office of the U.S. Trustee
   230 N. First Ave., #204
10 Phoenix, AZ 85003-1706                                  Email: Christopher.J.Pattock@usdoj.gov

11
   By     /s/ M.B. Thompson
12          Judicial Assistant